IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| GALVESTON BEACH TO BAY PRESERVE, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | § § § | CIVIL ACTION NO. G-07-0549 |
| Defendants, | § § | |
| v. | § § | |
| ANCHOR BAY, LTD. and FRANKLIN JONES, III, | § § § | |
| Intervenors. | § § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court are Plaintiffs'[1] Motion for Summary Judgment (Docket Entry No. 63), Intervenors'[2] Cross-Motion for Summary Judgment (Docket Entry No. 77), and Defendants'[3] Motion for

---

[1]Plaintiffs in this action are: (1) Galveston Beach to Bay Preserve, (2) Spanish Grant Civic Association Sections 1 and 2, Inc., (3) Lafitte's Cove at Pirate's Beach Nature Society, (4) Scenic Galveston, Inc., and (5) Sierra Club.

[2]Intervenors in this action are: (1) Anchor Bay, Ltd. and (2) Franklin Jones, III.

[3]Defendants in this action are: (1) United States Army Corps of Engineers, (2) Lieutenant General Robert L. Van Antwerp, in his official capacity as Commanding General and Chief of the U.S. Army Corps of Engineers, (3) Colonel David C. Weston, in his official capacity as District Engineer of the U.S. Army Corps of Engineers, and (4) Pete Geren, in his official capacity as Secretary of the Army.

Summary Judgment (Docket Entry No. 80).[4]  Intervenors also move the court to assess expenses and attorneys' fees against Plaintiffs' counsel pursuant to 28 U.S.C. § 1927.[5]  For the reasons stated below, Plaintiffs' motions for summary judgment will be granted in part and denied in part and Defendants' and Intervenors' motions for summary judgment will be granted in part and denied in part. The court will deny Intervenors' motion for expenses and attorneys' fees.

## I.  Background

Anchor Bay, Ltd. and Franklin Jones, III ("Intervenors") have designed and proposed to construct the Anchor Bay Subdivision ("Anchor Bay"), a 142-acre "bulkhead canal home development"[6] located on a 500-acre tract of currently undeveloped real estate on the west end of Galveston Island.[7]  Once complete, 249 of Anchor Bay's 263 residential lots will have canal frontage and a boathouse,[8] while six additional lots will have access to three

---

[4]Plaintiffs also filed Plaintiffs' Consolidated Reply and Response to Cross-Motion for Summary Judgment (Docket Entry No. 82).

[5]See Intervenors' Amendment to Response to Plaintiffs' Motion for Summary Judgment and Intervenors' Cross-Motion for Summary Judgment, Docket Entry No. 77, at 26-27.  In response, plaintiffs filed Plaintiffs' Response to Intervenors' Motion for Sanctions Under 28 U.S.C. § 1927 (Docket Entry No. 83).

[6]Administrative Record ("AR") at 2010.

[7]Id. at 2010, 2017.

[8]See id. at 2013, 2024, 2026.

piers extending into Mensell Bayou.[9]  Some of the lots will front
the existing Spanish Grant Channel, which bounds the western edge
of the Anchor Bay property and provides marine access to West
Galveston Bay ("West Bay") for residents of the existing, adjacent
Spanish Grant Subdivision.[10]  Other lots will front new canals,
which will be dredged from forty acres of upland prairie.[11]  The new
canals will be connected with the Spanish Grant Channel, giving all
Anchor Bay residents marine access to West Bay.[12]  The construction
of Anchor Bay will require the filling or excavation of 4.02 acres
of wetlands and sand flats.[13]

Development of Anchor Bay cannot proceed unless and until
Intervenors obtain a permit from the United States Army Corps of
Engineers ("the Corps") pursuant to Section 404 of the Clean Water
Act ("CWA") and Section 10 of the Rivers and Harbors Act.  See 33
U.S.C. §§ 403, 1344.  Intervenors first submitted a permit
application for Anchor Bay to the Corps in January of 2002.[14]  After
conducting an environmental assessment ("EA") ("September 2003
EA") pursuant to the National Environmental Policy Act ("NEPA") and

---

[9]Id. at 2011.

[10]Id. at 2010.

[11]See id. at 2025.

[12]Id. at 2010.

[13]Id. at 2011.

[14]See AR at 7.

the regulations promulgated thereunder[15] -- which culminated in a finding of no significant impacts ("FONSI")[16] -- issuing a public notice, and providing for a public comment period,[17] the Corps issued permit number 22590 on September 30, 2003, authorizing Intervenors to proceed with the development of Anchor Bay.[18]

Intervenors, however, could not immediately begin construction because the City of Galveston had not yet approved the plats for the new subdivision.[19]   Additionally, concerns about the water quality in the new canals and the Spanish Grant Channel arose based on water quality studies conducted after the issuance of the original permit, prompting the Corps to request that Intervenors not begin construction on Anchor Bay until water quality concerns were addressed.[20]   Intervenors also decided to make a few changes to their original design that were unrelated to environmental concerns.[21]   In the ensuing months, Intervenors submitted three

---

[15]See id. at 359-387.  As explained in greater detail infra, an EA is "a concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement,"  40 C.F.R. § 1508.9(a)(1), which is an extensive and detailed analysis of the environmental consequence of the proposed agency action.

[16]See AR at 370.  When an agency makes a FONSI, this means that it has concluded that an environmental impact statement is not required.  See 40 C.F.R. § 1508.13.

[17]See AR at 117-266.

[18]See id. at 394-396.

[19]See id. at 2013-2015.

[20]Id.

[21]Id.

permit amendment applications, numbered 22590(1), 22590(2), and 22590(3), which were all withdrawn before they were approved.[22]

After (1) water quality studies were conducted to determine the optimum design to avoid water quality problems, (2) the plat approval process was completed, and (3) Intervenors incorporated desired design changes, Intervenors submitted a permit amendment application, numbered SWG-2007-388, on March 5, 2007.[23] Importantly, this design called for the widening of the existing Spanish Grant Channel to avoid the construction of boathouses on property underlying the channel not owned by Intervenors.[24] The Corps reviewed the application and conducted another public notice and comment period.[25] The Corps also prepared a revised EA ("August 2007 EA") pursuant to NEPA[26] -- this time incorporating by reference[27] a detailed document entitled <u>Cumulative Impact Analysis, West Galveston Island, Galveston County, Texas, USACE -- Galveston Division -- Regulatory Branch, August 2007</u> ("CIA"). The CIA described the effects of past, currently proposed, and reasonably

_____

[22]<u>Id.</u>

[23]<u>Id.</u> at 2015.

[24]<u>Id.</u> at 2010.

[25]<u>See</u> <u>id.</u> at 1683-1688, 1741-83, 1901-60.

[26]<u>See</u> <u>id.</u> at 2010-37.

[27]<u>See</u> <u>id.</u> at 2023 ("An analysis entitled <u>Cumulative Impact Analysis, West Galveston Island, Galveston County, Texas, USACE -- Galveston Division -- Regulatory Branch, August 2007</u>, is incorporated by reference . . . .").

foreseeable future developments on the west end of Galveston Island.[28]   The August 2007 EA again resulted in a FONSI.[29]   On September 7, 2007, the Corps issued Permit SWG-2007-388 as an amendment to Permit 22590.[30]

Displeased with the Corps' permit review and approval procedures, Plaintiffs -- a coalition of environmental groups and local homeowners' associations -- filed this action on November 27, 2007, against the Corps and several Army officials.[31]   Plaintiffs alleged, among other things, that the Corps failed to meet several procedural obligations under the NEPA and the CWA during its review of the application for Permit SWG-2007-388.[32]   Plaintiffs sought, inter alia, injunctive relief declaring Permit SWG-2007-388 void and remanding the permit to the Corps for further action.[33]   Intervenors, the developers of Anchor Bay, filed an Unopposed Motion to Intervene on March 14, 2008,[34] which the court granted on March 17, 2008.[35]

---

[28]See id. at 2038-75.

[29]Id. at 2026.

[30]See id. at 2086-88.

[31]See Plaintiffs' Original Complaint and Application for Injunctive Relief, Docket Entry No. 1.

[32]See id.

[33]See id.

[34]Unopposed Motion to Intervene, Docket Entry No. 29.

[35]Order, Docket Entry No. 31.   Intervenors' Plea in Intervention was docketed on the same day.   See Anchor Bay's Plea in Intervention, Docket Entry No. 32.

About the same time, on March 12, 2008, Intervenors filed an application with the Corps seeking yet another amendment to their permit.[36]  On February 19, 2008, the City of Galveston Planning Commission refused to approve the widening of the Spanish Grant Channel.[37]  This prevented Intervenors from constructing Anchor Bay according to the plans approved in Permit SWG-2007-388 and necessitated an amendment to the permit to reflect the fact that the channel would remain at its existing width, as had been authorized in the original Permit 22590.[38]  This refusal also forced Intervenors to obtain an easement from the party owning the land underlying the Spanish Grant Channel to facilitate the construction of boathouses for the lots fronting the Spanish Grant Channel.[39]  In light of these evolving circumstances, the parties filed an Unopposed Joint Motion for Continuance on June 24, 2008,[40] which the court granted the following day.[41]  The amendment application did not propose any changes other than the omission of the proposed widening of the Spanish Grant Channel.[42]

---

[36]See AR at 2286.

[37]Id.

[38]See id.

[39]See id.

[40]Unopposed Joint Motion for Continuance, Docket Entry No. 46.

[41]Order on Unopposed Joint Motion for Continuance, Docket Entry No. 47.

[42]AR at 2286.

On July 24, 2008, the Corps issued a brief addendum to the August 2007 EA.[43]  The addendum explained that because the scope of the proposed project was now smaller than had already been authorized, "we believe the revised project will not result in adverse direct and cumulative impacts to the environment."[44]  The Corps did not issue public notice of this amendment or allow for an official comment period.  Nevertheless, the Corps received several comments from interested parties regarding the proposed amendment and included them in the administrative record.[45]  On August 21, 2008, the Corps issued an amendment to Permit SWG-2007-388 ("August 2008 amendment") "reflect[ing] a recent decision made by the City of Galveston that the Spanish Grant Channel should not be widened, as previously authorized in the most recent amendment to [the] permit."[46]

On August 26, 2008, Plaintiffs moved the court for leave to file a Second Amended Complaint based on the change in circumstances related to Permit SWG-2007-388 since the commencement of this action.[47]  The court granted this motion on November 13,

---

[43]Id. at 2338-40.

[44]Id. at 2339.

[45]See id. at 2342-95.

[46]Id. at 2403.

[47]Motion for Leave to File Plaintiffs' Second Amended Complaint and Application for Injunctive Relief, Docket Entry No. 57.

2008.[48]  In their Second Amended Complaint Plaintiffs assert four causes of action.[49]  First, Plaintiffs allege that the Corps violated NEPA by failing to properly analyze cumulative impacts of the proposed Anchor Bay development and other past, present, and reasonably foreseeable future actions.[50]  Second, Plaintiffs assert that the Corps violated NEPA by failing to conduct a single, comprehensive environmental impact statement ("EIS") evaluating the environmental impact of all pending permit applications affecting the west end of Galveston Island, including the Anchor Bay application.[51]  Third, Plaintiffs contend that the Corps violated the CWA by failing to issue public notice of and allow for public comment on the August 2008 amendment.[52]  Finally, Plaintiffs allege that the Corps violated the CWA by failing to properly analyze the safety implications of the increased boat traffic on the Spanish Grant Channel that will result from the Anchor Bay development and the Marquette development, another proposed development that will also utilize the channel if built as planned.[53]

---

[48]Order, Docket Entry No. 70.

[49]See Plaintiffs' Second Amended Complaint and Application for Relief, Docket Entry No. 71.

[50]Id. ¶¶ 138-149.

[51]Id. ¶¶ 150-156.

[52]Id. ¶¶ 157-162.

[53]Id. ¶¶ 163-168.

Plaintiffs seek a permanent injunction ruling that the Corps violated NEPA and/or the CWA and that Permit SWG-2007-388 is void, and remanding the permit to the Corps to conduct a revised EA or a comprehensive EIS pursuant to NEPA, and/or for further evaluation under the CWA.[54]  Plaintiffs also request that the court order the Corps to issue public notice of the August 2008 amendment and allow public comment.[55]  Finally, Plaintiffs request that the court enjoin the Corps from issuing any new or amended permits involving developments on the west end of Galveston Island or affecting West Bay until a comprehensive EIS is completed.[56]   Plaintiffs, Defendants, and Intervenors have all filed motions for summary judgment.

## II.   Cross-Motions for Summary Judgment

### A.   Standard of Review

"Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record . . . ."  Tex. Comm. on Natural Res. v. Van Winkle, 197 F. Supp. 2d 586, 595 (N.D. Tex. 2002) (quoting Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995)).  A court normally grants summary judgment "if the

---

[54]Id. ¶¶ 180-182.

[55]Id. ¶ 181.

[56]Id. ¶ 183.

pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). When a court is reviewing the decision of an administrative agency, however, "a motion for summary judgment stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." Van Winkle, 197 F. Supp. 2d at 595 (quoting Piedmont Envtl. Council v. U.S. Dep't of Transp., 159 F. Supp. 2d 260, 268 (W.D. Va. 2001)) (internal quotation marks omitted). Therefore, the role of the district court in reviewing the agency's decision on a motion for summary judgment "is to determine whether as a matter of law, evidence in the administrative record permitted the agency to make the decision it did . . . ." Id. at 595 (quoting Sierra Club v. Dombeck, 161 F. Supp. 2d 1052, 1064 (D. Ariz. 2001)).

The deferential "arbitrary and capricious" standard applies. Sabine River Authority v. U.S. Dep't of Interior, 951 F.2d 669, 678 (5th Cir. 1992). See also 5 U.S.C. § 706(2)(A) (allowing courts to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."). Under this standard of review, "a reviewing court has the 'least latitude in finding grounds for reversal.'" Sabine River Authority, 951 F.2d at 678 (quoting North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538

-11-

(11th Cir. 1990)).  As long as "the agency arrived at a reasoned judgment based on a consideration and application of the relevant factors," the court must uphold the agency's decision.  <u>Id.</u>  The court may not substitute its own judgment for that of the agency. <u>Id.</u>  Nevertheless, the court's review must be "searching and careful," <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 91 S. Ct. 814, 824 (1971), and the agency must have "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.</u>, 103 S. Ct. 2856, 2866 (1983) (quoting <u>Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 95 S. Ct. 438, 442 (1973)).

**B.   NEPA Compliance**

   1.   <u>The NEPA Framework</u>

"NEPA was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." <u>Dep't of Transp. v. Public Citizen</u>, 124 S. Ct. 2204, 2209 (2004) (quoting 42 U.S.C. § 4321)).  NEPA, however, does not accomplish this objective by mandating particular results or prohibiting or controlling certain harmful activities.  <u>Id.</u>  In fact, "NEPA does not prohibit the undertaking of federal projects patently destructive of the environment . . . ." <u>Sabine River Authority</u>, 951 F.2d at 676. Instead, "NEPA imposes only procedural requirements on federal

agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." Public Citizen, 124 S. Ct. at 2209. NEPA requires only that federal agencies be informed of and take a "hard look" at the environmental consequences of their actions before they proceed, not that they actually make wise environmental decisions. Sabine River Authority, 951 F.2d at 676.

NEPA requires all federal agencies, before engaging in certain activities, to prepare detailed EISs, which describe and analyze the adverse environmental effects of the proposed agency action. See 42 U.S.C. § 4332(2)(C); O'Reilly v. U.S. Army Corps of Engineers, 477 F.3d 225, 228 (5th Cir. 2007). An agency must prepare an EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C).

To help agencies determine whether EISs must be prepared for particular actions they may be contemplating, NEPA authorizes the Council on Environmental Quality ("CEQ") to promulgate regulations. Public Citizen, 124 S. Ct. at 2209; see also 40 C.F.R. § 1500.3. These regulations are "binding on federal agencies." Fritiofson v. Alexander, 772 F.2d 1225, 1236 (5th Cir. 1985), overruled on other grounds by Sabine River Authority, 951 F.2d at 678 & n.1).

If an agency action is one that does not clearly require an EIS, but is not so insignificant as to be categorically exempted

-13-

from the requirement to prepare an EIS, CEQ regulations provide that the agency should prepare an EA.  <u>Public Citizen</u>, 124 S. Ct. at 2209-10 (citing 40 C.F.R. §§ 1501.4(a)-(b)).  An EA should be "a concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] . . . ."  40 C.F.R. § 1508.9(a)(1).  In other words, an EA is "a rough-cut, low-budget [EIS] designed to show whether a full-fledged [EIS] -- which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project -- is necessary."  <u>Sabine River Authority</u>, 951 F.2d at 677.  An EA must culminate in either of two findings:  (1) a finding that the proposed action will significantly affect the quality of the human environment, such that a full EIS is required, or (2) a FONSI, such that a full EIS is not required.  <u>Sabine River Authority</u>, 951 F.2d at 677.  If the agency makes a FONSI, it "must briefly state 'the reasons why the proposed agency action will not have a significant impact on the human environment.'"  <u>O'Reilly</u>, 477 F.3d at 228 (quoting <u>Coliseum Square Ass'n, Inc. v. Jackson</u>, 465 F.3d 215, 224 (5th Cir. 2006)).

"As is readily apparent, the decision whether to prepare an EIS may turn in large part on the definition of the term significantly."  <u>Fritiofson</u>, 772 F.2d at 1236.  Unfortunately, "the meaning of the term 'significance' for purposes of the NEPA statute is not clear on its face."  <u>Spiller v. White</u>, 352 F.3d 235, 244 n.5 (5th Cir. 2003).  NEPA itself does not define the term, but CEQ

regulations do provide some factors that agencies should consider when making a significance determination.  See 40 C.F.R. § 1508.27. "Significantly as used in NEPA requires consideration of both context and intensity."  Id.  Consideration of context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality."  Id. at § 1508.27(a). Consideration of intensity "refers to the severity of impact."  Id. at § 1508.27(b).

The regulation lists ten factors that should be considered when evaluating intensity, but the Plaintiffs in this action have focused exclusively on one:  "[w]hether the action is related to other actions with individually insignificant but cumulative significant impacts."  See id. at § 1508.27(b)(7).  The regulation states that "[s]ignificance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." Id.  Cumulative impact is defined as

> the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

Id. at § 1508.7.  The Fifth Circuit has explained that

> a meaningful cumulative effects study must identify: (1) the area in which effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions -- past, proposed, and reasonably foreseeable -- that have

-15-

had or are expected to have impacts in the same area;
(4) the impacts or expected impacts from these other
actions; and (5) the overall impact that can be expected
if the individual impacts are allowed to accumulate.

Fritiofson, 772 F.2d at 1245.

2.   Analysis

Plaintiffs assert that the FONSI for Anchor Bay -- and thus
the Corps' decision not to prepare an EIS -- was arbitrary and
capricious for several reasons, each of which are addressed below.
The Corps' decision to forego preparing an EIS may be arbitrary and
capricious in either of two ways:  "(1) the evidence before the
court demonstrates that, contrary to the FONSI, the project may
have a significant impact on the human environment, or (2) the
agency's review was flawed in such a manner that it cannot yet be
said whether the project may have a significant impact."
Fritiofson, 772 F.2d at 1238.[57]

(a)  Impacts From the Proposed Marquette Development

Plaintiffs first contend that the Corps' NEPA review for the
August 2008 amendment was flawed because the Corps' analysis of
cumulative impacts did not consider impacts from the Marquette

---

[57]The Fifth Circuit stated in Fritiofson that these are two
reasons a FONSI may be "unreasonable."  Fritiofson, 772 F.2d at
1238.  In Sabine River Authority, however, the Fifth Circuit
acknowledged that the proper standard of review is "arbitrary and
capricious," not unreasonableness.  Sabine River Authority, 951
F.2d at 678 & n.1.  As the Sabine River Authority panel noted,
however, there is little difference between the two standards.  See
id. at 678 n.3.

development, another development project that is proposed to be constructed near the Anchor Bay site.[58]   The CIA, which was completed in August of 2007, mentions the Marquette development, classifying it as a reasonably foreseeable future action that would affect the west end of Galveston Island.[59]   The CIA explains that the Corps had held pre-application meetings with the Marquette developers and describes the property where the development is proposed to be built.   The CIA then states that "development plans have not been finalized to the point to be able to estimate what exact resource impacts will result from the Marquette development plans."[60]

Plaintiffs allege that in the year between August of 2007, when the CIA was completed, and August of 2008, when the Corps approved the August 2008 amendment to Permit SWG-2007-388, two permit applications were filed with the Corps for the Marquette development.   The Plaintiffs assert, therefore, that the details of the Marquette development were sufficiently defined in August of 2008 so that the Corps could have estimated the impacts from the Marquette development and should have updated the CIA and/or the August 2007 EA and its significance analysis to account for those impacts before issuing the August 2008 amendment.   The addendum to

_____

[58]Plaintiffs' Motion for Summary Judgment, Docket Entry No. 63, at 18-20.

[59]AR at 2050.

[60]Id.

-17-

the August 2007 EA issued by the Corps on July 24, 2008, did not mention the Marquette development or any other new circumstances related to actions other than the Anchor Bay project.[61]

"NEPA and its regulations require agencies to take a 'hard look' at the 'significance' of the consequences of their actions before issuing an EA/FONSI . . . but also contemplate the reality that, after the formal issuance of an EIS or EA/FONSI, it is often the case that new information comes to light or the project changes." Highway J Citizens Group v. Mineta, 349 F.3d 938, 958 (7th Cir. 2003). Although the CEQ regulations do not explain if or when an EA must be supplemented to reflect new information, they do define when an agency must supplement an EIS. See 40 C.F.R. § 1502.9(c) (requiring agencies to supplement EISs if "[t]he agency makes substantial changes in the proposed action," or if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts"). Courts have found these regulations and associated case law instructive when deciding whether an agency should have updated an EA. See, e.g., Highway J Citizen Group, 349 F.3d at 959-60 (looking to regulations and case law regarding when an EIS must be supplemented to determine whether an agency should have supplemented an EA); Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp., 113 F.3d 1505, 1509-10 (9th Cir. 1997) (holding that the

---

[61] See id. at 2338-40.

-18-

standard for supplementing an EA is the same as for an EIS). Therefore, applying the standard for determining when an EIS must be supplemented, the Corps was required to supplement the August 2007 EA to evaluate the impacts from the Marquette development if, based on the information available at the time, it was sufficiently clear that the impacts from Marquette would be significant.  See 40 C.F.R. § 1502.9(c)(ii); Price Rd. Neighborhood Ass'n, 113 F.3d at 1510 ("[W]hether a supplemental EA is required depends on the significance of the new impacts.").

The Corps argues that even though permit applications had been submitted for the Marquette development in August of 2008, the permitting process was still ongoing.[62]  The Corps contends that because the plans for Marquette were still evolving in August of 2008, any attempt to assess impacts from the Marquette development would be purely speculative.[63]  Therefore, the Corps asserts that its consideration of the Marquette development in the August 2007 EA was sufficient.  See Gulf Restoration Network v. U.S. Dep't of Transp., 452 F.3d 362, 370-71 (5th Cir. 2006) (holding that when "the occurrence of any one of a number of contingencies could cause the plans to [proceed with an action] to be cancelled or drastically altered" the impacts from that action need not be

---

[62]Defendants' Response to Plaintiffs' Motion for Summary Judgment and Memorandum in Support of Its Cross-Motion for Summary Judgment, Docket Entry No. 79, at 21.

[63]Id.

considered in an analysis of impacts from "reasonably foreseeable future actions").

The administrative record contains only limited information on the Marquette development.[64] It is mentioned in several letters and e-mails received by the Corps from the public while the Corps was considering the August 2008 amendment.[65] Several commentators urged the Corps to consider the impacts from the proposed Marquette development in its review of the August 2008 amendment.[66] These comments by the public, however, do not establish that the expected impacts from the Marquette development could have reasonably been determined with any certainty at that time. See Gulf Restoration Network, 452 F.3d at 370-71. Nor do these comments establish that the impacts from the Marquette development, which are still uncertain, will be significant. See Price Rd. Neighborhood Ass'n, 113 F.3d at 1510. Therefore, based on the information contained in the administrative record, the court cannot conclude that the Corps' decision not to update its analysis of cumulative impacts to

_____

[64]Plaintiffs moved to supplement the administrative record with the permit applications for the Marquette development, the associated public notice documents, and the comments received. See Motion to Supplement the Administrative Record, Docket Entry No. 60. The court denied that motion. See Order Denying Plaintiff's Motion to Supplement Administrative Record, Docket Entry No. 73.

[65]See AR at 2342-95. Although the Corps did not issue public notice for the August 2008 amendment, several members of the public nevertheless submitted comments. The Corps included these in the administrative record.

[66]See AR at 2342-95.

include more detail regarding the potential impacts from the Marquette development was arbitrary and capricious.  See Fla. Power & Light, 105 S. Ct. at 1607 (explaining that the court must review agency decisions based on the administrative record before the agency at the time it made its decision).

        (b)  Impacts on Boat Traffic and Safety in the Spanish Grant Channel

Plaintiffs also assert that the Corps' review of the August 2008 amendment was deficient because the Corps did not consider the cumulative impact of the changes to the design of Anchor Bay and the Marquette development on boat traffic in the Spanish Grant Channel.[67]  Specifically, Plaintiffs contend that the Corps should have supplemented the August 2007 EA before issuing the August 2008 amendment to account for (1) the fact that the Spanish Grant Channel will not be widened and (2) the increased boat traffic on the channel that will result from the Marquette development, which if constructed as planned will also utilize the Spanish Grant Channel for marine access to West Bay.  For the reasons stated above, the Corps did not act in an arbitrary and capricious manner by not supplementing the August 2007 EA to discuss potential impacts from the Marquette development.  But, the court must still determine whether the Corps satisfied its responsibilities under

---

[67]Plaintiffs' Motion for Summary Judgment, Docket Entry No. 63, at 18-20.

NEPA to evaluate the impacts of the design change for Anchor Bay proposed in the August 2008 amendment.

"[A]n agency need not start the environmental assessment process anew with every change in a project." Price Rd. Neighborhood Ass'n, 113 F.3d at 1509. NEPA requires only that an agency "take a 'hard look' at the environmental impacts of project changes." Id. at 1510. The agency must supplement its original EA only if it "is not longer valid." Id. Whether the EA remains valid "depends on the significance of the new impacts." Id.; see also Highway J Citizens Group, 349 F.3d at 959 ("In this case, the [agency] determined that the impacts of the [changes to the proposed action] were insignificant and that the EA/FONSI remained valid; thus, no supplementation was required.").

In the August 2007 EA the Corps analyzed Anchor Bay's direct and cumulative impacts on navigation and boating safety in the Spanish Grant Channel.[68] The Corps' navigation and safety analyses both stated that after boathouse construction, at least sixty feet of navigable space would remain within the Spanish Grant Channel.[69] In light of this remaining navigable space, in conjunction with a five mile-per-hour speed limit that will be imposed in the channel, the Corps concluded that the potential adverse impacts on safety and navigation would be minimal.[70]

---

[68]See AR at 2020, 2022, 2026.

[69]AR at 2020, 2022.

[70]Id.

When Intervenors subsequently proposed to amend Permit SWG-2007-388 to omit the widening of the Spanish Grant Channel, the Corps concluded that "the revised project design will not result in adverse direct and cumulative impacts . . . ."[71] Plaintiffs contend that this analysis is "absurd" with regard to boating safety and navigation in the Spanish Grant Channel.[72] A close inspection of the administrative record, however, demonstrates that it is not.

In the September 2003 EA, which the Corps' developed for the original Permit 22590, the Corps' safety and navigation analyses stated that the Spanish Grant Channel would have at least sixty feet of remaining navigable space after the construction of boat houses and that Anchor Bay's impact on navigation and boating safety would be minimal.[73] Importantly, the plans approved in Permit 22590 <u>did not</u> involve widening the Spanish Grant Channel. Apparently, therefore, the Corps' safety and navigation analyses included in the August 2007 EA did not account for the widening of the channel, even though it was proposed in the application for Permit SWG-2007-388. Yet, the Corps still concluded that Anchor Bay's impacts on boating safety and navigation would be minimal. Therefore, because the Corps' analysis in the August 2007 EA did not assume that the channel would be widened, it was not arbitrary

---

[71]<u>Id.</u> at 2239.

[72]Plaintiffs' Motion for Summary Judgment, Docket Entry No. 63, at 21.

[73]AR at 364, 366-67.

and capricious for the Corps to conclude in August of 2008 that the proposed design change, which omitted the widening of the channel, would not result in any significant new or different impacts with regard to boating safety and navigation in the Spanish Grant Channel.  Moreover, it would be useless and redundant to force the Corps to reconsider these impacts.  See Highway J Citizens Group, 349 F.3d at 959; see also Price Rd. Neighborhood Ass'n, 113 F.3d at 1510 (explaining that courts should not "task the agencies with a sisyphean feat of forever starting over in their environmental evaluations, regardless of the usefulness of such efforts").  The Corps satisfied its NEPA obligations with regard to considering the impacts on boat traffic in the Spanish Grant Channel resulting from the changes to the Anchor Bay design.

> (c)   Addition of Impacts from Anchor Bay to Impacts from Other Actions

The Plaintiffs next argue that the Corps' review was flawed because the Corps' analysis of cumulative impacts failed to adequately consider the fifth of five factors that the Corps must evaluate under the Fifth Circuit's holding in Fritiofson.[74]  The fifth factor requires consideration of "the overall impact that can be expected if the individual impacts are allowed to accumulate." Fritiofson, 772 F.2d at 1245.

---

[74]Plaintiffs' Motion for Summary Judgment, Docket Entry No. 63, at 21-25.

-24-

Plaintiffs acknowledge, and the court agrees, that the Corps adequately discussed the first, third, and fourth <u>Fritiofson</u> factors in the CIA.[75]  Further, the Corps clearly satisfied the second factor by including a detailed discussion of the expected impacts from Anchor Bay in the August 2007 EA.[76]  But Plaintiffs contend that the Corps failed to satisfy the fifth factor because it "did not accumulate the impacts of Anchor Bay with those that were disclosed in the CIA."[77]

Implicitly, the Plaintiffs assert that the impacts disclosed in the CIA did not include the impacts from Anchor Bay, but only included impacts from actions other than Anchor Bay.  If this assertion were correct, the Plaintiffs' argument would be valid.[78] The CIA, however, clearly states that it includes, as a past

---

[75]The first, third, and fourth <u>Fritiofson</u> factors are: "(1) the area in which effects of the proposed project will be felt; . . . (3) other actions -- past, proposed, and reasonably foreseeable -- that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions." <u>Fritiofson</u>, 772 F.2d at 1245.  <u>See</u> AR at 2038 (discussing the first factor); <u>id.</u> at 2043-2050 (discussing the third factor); <u>id.</u> at 2050-2063 (discussing the fourth factor).

[76]The second <u>Fritiofson</u> factor is "(2) the impacts that are expected in that area from the proposed project." <u>Fritiofson</u>, 772 F.2d at 1245.  <u>See</u> AR at 2023-26 (discussing, in detail, the expected impacts from the Anchor Bay development).

[77]Plaintiffs' Motion for Summary Judgment, Docket Entry No. 63, at 24.

[78]The section in the August 2007 EA entitled "Cumulative Impacts" only discusses the impacts from Anchor Bay itself and refers the reader to the CIA for a discussion of impacts from other projects.  <u>See</u> AR at 2023-26.

action, already-issued Permit 22590 for Anchor Bay and, as a presently proposed action, the then-pending Permit Application SWG-2007-388 for Anchor Bay.[79]  The court, therefore, must presume that the discussion in Parts V and VI of the CIA[80] -- which discusses the cumulative impacts from all of the past, present, and reasonably foreseeable future actions described in the CIA -- includes the impacts from the Anchor Bay development, as authorized in Permit SWG-2007-388, added to and accumulated with the impacts from the other past, present, and reasonably foreseeable future actions described in the CIA.[81]  Although neither the August 2007 EA nor the CIA explicitly spell out the addition of impacts from actions other than Anchor Bay with the impacts from Anchor Bay in the level of detail that the Plaintiffs would require, <u>Fritiofson</u> does not mandate this level of detail.  It only requires that the agency

---

[79]<u>See</u> <u>id.</u> at 2044 (describing the issuance of Permit 22590 for Anchor Bay in September of 2003 as a past action included in the cumulative impacts analysis); <u>id.</u> at 2047-48 (describing the pending application to amend Permit 22590 for Anchor Bay as a present, proposed action included in the cumulative impacts analysis).  Although the CIA identifies the currently pending proposed application to Permit 22590 as "Permit Application 22590(03)," an application which was withdrawn in March of 2007, <u>see</u> <u>id.</u> at 2015, the description of the permit amendment application makes clear that the Corps was considering the then-pending Permit Application SWG-2007-388.  <u>See</u> <u>id.</u> at 2047-48.

[80]<u>See</u> AR at 2050-68.

[81]The Corps concluded in the July 2008 addendum to the EA that the design changes to Anchor Bay authorized in the August 2008 amendment to Permit SWG-2007-388 did not result in new or different impacts of sufficient consequence to warrant a revision to this analysis.  <u>See</u> AR at 2339.

consider "the overall impact that can be expected if the individual impacts are allowed to accumulate." Fritiofson, 772 F.2d at 1245. The Corps adequately considered this factor.

(d)  Comprehensive, Regional EIS

Plaintiffs also contend that the facts stated in the August 2007 EA and the CIA demonstrate that the court should order the Corps to conduct an EIS because the cumulative impacts of the past, present, and reasonably foreseeable future development projects on the west end of Galveston Island, including Anchor Bay, may have a significant impact on the human environment.[82]  Plaintiffs further assert that the EIS should be a comprehensive EIS, which would evaluate in one document all proposed projects affecting the west end of Galveston Island.[83]

When a plaintiff challenges an agency's decision not to prepare an EIS the court may only order the agency to conduct an EIS if it finds that the administrative record demonstrates that the proposed project may have a significant impact.  Fritiofson, 772 F.2d at 1238.  If, on the other hand, the court concludes "that the EA is inadequate in a manner that precludes making the determination whether the project may have a significant impact, the court should remand the case to the agency to correct the

---

[82]See Plaintiffs' Motion for Summary Judgment, Docket Entry No. 63, at 28-31.

[83]See id. at 25-31.

deficiencies in its analysis." Id. "Only in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." O'Reilly, 477 F.3d at 239 (quoting Fla. Power & Light Co. v. Lorion, 105 S. Ct. 1598, 1607 (1985)).

The administrative record in this case contained a number of findings as to the cumulative impacts of past, present, and reasonably foreseeable future actions on wetlands, upland prairie, and coastal hazards.[84] With regard to wetlands, the Corps found in the CIA that the west end of Galveston Island has suffered "a dramatic loss of wetlands and aquatic habitat since the 1950's."[85] The Corps stated that "the cumulative impacts to both freshwater and saltwater wetlands and tidal flats have been substantial."[86] The Corps explained that wetlands losses have slowed since the 1990's and that "[p]roposed present and reasonably foreseeable future development projects will likely involve fewer wetland impacts than historical developments due to present regulatory program requirements."[87] Pointing to its "No Net Loss" policy for wetland permits, the Corps stated that "new habitat restoration and

---

[84] As the court has already concluded, the Corps' findings regarding cumulative impacts in the CIA include the impacts from the Anchor Bay development, not just the impacts from other actions.

[85] AR at 2054.

[86] Id. at 2065.

[87] Id.

conservation projects will facilitate the recovery of wetland losses that have occurred in the West Galveston Bay area."[88]   The Corps' cumulative impacts analysis for wetlands concluded, however, with the finding that "the aerial extent of wetlands and tidal flats within this area may continue to remain in a state of fluctuation rather than experience a positive growth trend."[89]

The Anchor Bay development will result in the filling of 4.02 acres of tidal and brackish wetlands.[90]   These wetland impacts, however, "will be offset by a variety of wetland creation, enhancement and preservation activities affecting at least 53 acres of land."[91]

As for upland prairie, the Corps found that "[u]pland habitats are being converted to developed land (residential, commercial/retail, golf, etc.) at a relatively high rate by developers desiring to construct projects with water-related amenities," and that it "expected that such trends for upland losses will continue."[92]   The Corps concluded that "if current trends continue, and development planning is not sensitive to the need for preservation of portions of the West End's remaining

---

[88] Id. at 2066.

[89] Id.

[90] Id. at 2025.

[91] Id.

[92] Id. at 2057.

undeveloped natural prairie habitat, the island's primary remaining habitat for wildlife, as well as resident and migratory birds, may experience an adverse cumulative impact."[93]

Anchor Bay "will result in the loss of approximately 150 acres of prairie uplands . . . with minimal compensation."[94]  Intervenors plan to donate a 9.31 acre section of mixed uplands and wetlands and a 0.80 section of mixed uplands and wetlands to a preservation organization.[95]

With regard to coastal hazards, the Corps found that "impacts associated with coastal hazards affecting the West End of Galveston Island have been substantial."[96]  Moreover, the Corps stated that "[d]evelopments built in these storm prone, erosive areas will have to face [the] likelihood of eventual destruction unless some type of intervention is considered."[97]

Anchor Bay "will be susceptible to storm damage, but not more so than other West End developments."[98]  It is "not expected to affect flood heights or drift."[99]  Moreover, it is not located in

---

[93]Id. at 2067.

[94]Id. at 2025

[95]Id. at 2012.

[96]Id. at 2067.

[97]Id.

[98]Id. at 2025.

[99]Id.

an area especially susceptible to storm surge wash-over during a
hurricane.[100]  "[O]nly the most severe storms would flood Anchor Bay
home sites."[101]

Many of these findings regarding cumulative impacts "would
seem to warrant a finding of significance . . . ." O'Reilly, 477
F.3d at 235.  The Corps, however, did not address significance in
the CIA, and included only a one-sentence significance analysis in
the August 2007 EA, summarily concluding that impacts were not
significant:

> When considering the overall impacts from the proposal,
> in context with the information and past, present and
> reasonably foreseeable future projects contained in the
> aforementioned     Cumulative     Impact     Analysis     --
> West  Galveston  Island  (2007),  the  project  will  not
> cumulatively raise any of the factors considered in this
> analysis to a significantly adverse level.[102]

Because of the brevity of this analysis, the court can only
speculate as to how and why the Corps concluded that cumulative
impacts to wetlands and coastal hazards -- which it characterized
as "substantial"[103] -- were not "significant."[104]  But the court may

---

[100]Id. at 2025-26.

[101]Id. at 2026.

[102]AR at 2026.

[103]As Plaintiffs point out, "substantial" is a synonym or near-
synonym of "significant," in its typical usage.  See Roget's II:
The New Thesaurus 520, 900, 970 (Expanded ed. 1988).

[104]Defendants argue in their summary judgment brief that the
FONSI  was  appropriate  because  of  the  mitigation  required  under
Permit SWG-2007-388.  An agency is indeed allowed to make a so-
called "mitigated FONSI" if the "agency or an involved third party
(continued...)

not engage in such speculation, for it is the agency, not the court, that must "supply a reasoned basis for the agency's action . . . ." SEC v. Chenery Corp., 67 S. Ct. 1575, 1577 (1947). Similarly, the court is unable to discern how the Corps was able to conclude that upland prairie habitat "may experience an adverse cumulative impact"[105] if current development trends continue, but not that this expected development trend "may have a significant impact." Fritiofson, 772 F.2d at 1238 (emphasis in original).

Although the court must give "deference to [the agency's] judgment as to whether any particular environmental impact of the proposed [action] rises to the level of significance," Spiller, 352 F.3d at 244 n.5, the agency must "articulate a satisfactory

---

[104](...continued)
agrees to employ certain mitigation measures that will lower the otherwise significant impacts of an activity on the environment to a level of insignificance." Spiller, 352 F.3d at 241. But if that was the Corps' reasoning in this case, it certainly did not say so in the August 2007 EA or the CIA. If the Corps was relying on mitigation to avoid a finding of significance, it must "explain why the mitigation requirements render the cumulative effects . . . less-than-significant . . . ." O'Reilly, 477 F.3d at 235 (emphasis in original). It did not do so. Moreover, the mitigation requirements in the permit relate almost solely to wetlands. See AR at 2011 (explaining that "the applicant will conduct a number of wetland creation, enhancement and preservation activities on at least 53 acres of land" to compensate for the 4.02 acres of wetlands that will be filled to construct Anchor Bay). As for upland prairie mitigation, Intervenors were only required to donate a 9.31 acres section of mixed uplands and wetlands and another 0.80 section of mixed upland and wetlands to a conservation organization. See id. at 2012. This compensation, which the Corps itself characterized as "minimal," pales in comparison to the 150 acres of prairie uplands that will be lost. Id. at 2025. No mitigation measures related to coastal hazards are discussed.

[105]AR at 2067.

explanation for its action including a 'rational connection between the facts found and the choice made.'" <u>Motor Vehicle Mfrs. Ass'n</u>, 103 S. Ct. at 2866 (quoting <u>Bowman Transp. Inc.</u>, 95 S. Ct. at 442). The Corps failed to do so in this case. Although the Corps' analysis of cumulative impacts may have discussed and considered all of the required <u>Fritiofson</u> factors, its explanation of its conclusion as to the <u>significance</u> of cumulative impacts in light of these factors is sorely lacking. The Corps' significance analysis is both too brief and too conclusory for the court to understand, in light of the facts found in the August 2007 EA and the CIA, how the Corps reached its conclusion that the impacts from the Anchor Bay development, when added to the impact from other past, present and reasonably foreseeable future actions, are not significant. Accordingly, the court concludes that the Corps' FONSI was arbitrary and capricious.

Because the court reaches this conclusion based on the inadequacy of the Corps' analysis, the appropriate remedy is not to order the Corps to conduct an EIS as the Plaintiffs contend.[106] <u>See</u> <u>Fritiofson</u>, 772 F.2d at 1239. Instead, the court will remand the case to the Corps to correct the deficiencies in its significance

---

[106]Plaintiffs also requested, in the alternative, that the court remand the case to the Corps for further analysis. <u>See</u> Plaintiffs' Second Amended Complaint and Application for Injunctive Relief, Docket Entry No. 71, at ¶ 180; Plaintiffs' Motion for Summary Judgment, Docket Entry No. 63, at 34.

analysis.[107]  See O'Reilly, 477 F.3d at 240; Fritiofson, 772 F.2d at 1239.

**C.    CWA Compliance**

    1.    Consideration of Impacts on Boating Safety and Navigation

    Section 404 of the CWA empowers the Corps to issue permits for the discharge of dredged and fill materials into "navigable waters." See 33 U.S.C. § 1344(a).  The Corps has promulgated regulations to guide it in deciding whether to issue permits under § 404.  The Corps' general policies for evaluating permit applications are found in 33 C.F.R. § 320.4.  This section requires the Corps to conduct "an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest" as a basis for its decision whether to issue a permit.  33 C.F.R. § 320.4(a)(1).  It further directs the Corps to consider a number of specific factors including navigation, safety, and the general needs and welfare of

_____

[107]Of course, if the Corps, upon further consideration, determines that impacts may be significant, it should conduct an EIS.  See O'Reilly, 477 F.3d at 240-41 (remanding "the case to the Corps for further proceedings including the preparation of a new EA, a new FONSI, or an EIS, or other appropriate disposition, consistent with this opinion" (emphasis added)).  It would be premature, however, for the court to decide now whether such an EIS should be a comprehensive, regional EIS, as the Plaintiffs contend. Similarly, it would be inappropriate for the court to enjoin the Corps from issuing other new or amended permits for developments on the west end of Galveston Island since it is not yet clear whether a comprehensive EIS will be required.

the people, among others. <u>Id.</u>  The Corps should grant a permit "unless . . . it would be contrary to the public interest." <u>Id.</u>

The Plaintiffs contend that the Corps failed to adequately analyze the impacts on boating safety and navigation in the Spanish Grant Channel resulting from the design change approved in the August 2008 amendment -- the omission of the widening of the channel -- and from the proposed Marquette development, which will also utilize the Spanish Grant Channel for marine access to West Bay, thus further increasing boat traffic in the channel.

As explained above, the administrative record does not include enough information on the Marquette development for the court to conclude that the Corps acted arbitrarily and capriciously by failing to consider the potential impacts of the Marquette development in its NEPA analysis.  For the same reasons, the Corps did not act arbitrarily and capriciously for failing to consider the potential impacts from the Marquette development in its CWA analysis.[108]  Also, for the same reasons that the court concluded that the Corps satisfied its obligations under NEPA to evaluate the impacts on boating safety and navigation of the design change omitting the widening of the Spanish Grant Channel, the court

---

[108]<u>See</u> <u>supra</u> Part II.B.(a).  The court assumes <u>arguendo</u> that the Corps' CWA regulations, like NEPA regulations, require the consideration of the impacts of other development projects in conjunction with the impacts from the proposed project.

concludes that the Corps satisfied its obligations under the CWA and associated regulations to evaluate those impacts.[109]

2.  Public Notice

The Corps has issued several public notices and received extensive comments regarding the Anchor Bay permit since the initial permit application was filed in 2002.[110]   The Corps, however, did not issue public notice for the August 2008 amendment. Plaintiffs contend this was a violation of the CWA's public notice requirement.   They assert that because the August 2008 amendment omitted the widening of the Spanish Grant Channel and was submitted after permit applications were submitted by others for the Marquette development, which will also utilize the Spanish Grant Channel, the public should have been given another opportunity to comment on Anchor Bay.

The CWA provides that the Corps may issue a § 404 permit only "after notice and opportunity for public hearings . . . ."  33 U.S.C. § 1344(a).  The Corps' implementing regulations provide:

_____

[109]See supra Part II.B.(b).

[110]The Corps first issued public notice on June 20, 2002, for Permit 22590, AR at 117, and received comments.  Id. at 128-266. The Corps issued public notice for a proposed amendment, Permit Application 22590(01), on December 29, 2003, id. at 477, and again received comments.   Id. at 491-503.  This application was later withdrawn.   Id. at 521.   The Corps issued public notice for another proposed amendment, Permit Application 22590(03), on August 15, 2005, id. at 783, and received comments.   Id. at 847-937.   This application was also withdrawn.   Id. at 1668-69.   Finally, the Corps issued public notice for Permit Application SWG-2007-388 on March 5, 2007, id. 1683, and again received comments.  Id. at 1741-83, 1901-60.

> Within 15 days of receipt of an application the district
> engineer will either determine that the application is
> complete . . . and issue a public notice . . ., unless
> specifically exempted by other provisions of this
> regulation or that it is incomplete and notify the
> applicant of the information necessary for a complete
> application. The district engineer will issue a
> supplemental, revised, or corrected public notice if in
> his view there is a change in the application data that
> would affect the public's review of the proposal.

33 C.F.R. § 325.2(a)(2). The Plaintiffs and the Defendants agree

that this situation is governed by the last sentence in this

regulation regarding supplemental, revised, or corrected public

notice.[111]

---

[111]See Plaintiffs' Motion for Summary Judgment, Docket Entry
No. 63, at 13 (quoting last sentence of 33 C.F.R. § 325.2(a)(2));
Defendants' Response to Plaintiffs' Motion for Summary Judgment and
Memorandum in Support of Its Cross-Motion for Summary Judgment,
Docket Entry No. 79, at 34 (same). The text of this sentence and
case law in which it has been applied suggest that it applies only
when a change is made to or additional material is submitted for a
pending permit application after public notice is given, but before
the permit is issued. See, e.g., Fund for Animals, Inc. v. Rice,
85 F.3d 535, 545 (11th Cir. 1996); Sierra Club v. U.S. Army Corps
of Engineers, 935 F. Supp. 1556, 1581 (S.D. Ala. 1996). The August
2008 amendment was a change to the already issued Permit SWG-2007-
388, not a change to a pending permit application. Therefore, it
was arguably a new permit application subject to the first sentence
of 33 C.F.R. § 325.2(a)(2), which automatically requires the Corps
to issue public notice, regardless of the significance of the
changes proposed. The Plaintiffs, however, have not asserted this
argument. On the other hand, the August 2008 amendment may more
accurately be classified as a permit "modification" under 33 C.F.R.
§ 325.7. Modifications do not require public notice unless they
involve "[s]ignificant increases in scope of a permitted activity,"
in which case, they are to be treated as "new applications for
permits" instead of modifications. 33 C.F.R. § 325.7(a). The
Corps clearly believed that the changes made in the August 2008
amendment were not significant. The administrative record
reflects, however, that the Corps never considered the August 2008
amendment to be a modification, nor have the Defendants argued that
it should be considered as such.

-37-

Because the change to proposed design -- omitting the widening of the Spanish Grant Channel -- involved "constructing a project smaller in scope than that which was authorized in their permit," the Corps concluded that the change to the proposed project "will not result in adverse direct and cumulative impacts to the environment,"[112] and considered this amendment merely "administrative."[113] See Fund for Animals, Inc. v. Rice, 85 F.3d 535, 545 (11th Cir. 1996) (holding that "the regulations give the Corps discretion about whether to issue supplemental public notice about" minor design changes, and concluding that it was not arbitrary and capricious for the Corps to consider the addition of a three-mile segment of road that affected less than one-half acre of additional wetlands a minor change not requiring supplemental public notice). Moreover, as the Corps points out, the public had already commented extensively on the original Permit 22590, which did not involve widening the Spanish Grant Channel. In light of the insignificance of the design change and the fact that the public had already commented on a design not involving the widening of the channel, the court cannot conclude that it was arbitrary and capricious for the Corps to determine that a return to the original design would not affect the public's perception of the proposal.

---

[112]AR at 2339.

[113]See id. at 2308, 2338, 2340 (referring to the amendment as "administrative").

-38-

Nor is the court persuaded by the Plaintiffs' argument that the design change, <u>in combination with</u> the fact that the more recently proposed Marquette development will utilize the Spanish Grant Channel, triggered the Corps' responsibility to issue another public notice.  As the Defendants point out, the second sentence of 33 C.F.R. § 325.2(a)(2) states that only a change in "<u>application</u> data" can trigger the Corps' responsibility to issue a supplemental, revised, or corrected public notice.   33 C.F.R. § 325.2(a)(2) (emphasis added).   The fact that another, separate development now proposes to use the same channel is not a change in "application data."   Therefore, the Corps was not required to consider changes in circumstances related to the Marquette development when deciding whether to issue supplemental public notice.

Furthermore, even if the Corps were required under 33 C.F.R. § 325.2(a)(2) to issue public notice for the August 2008 amendment, Plaintiffs have "failed to demonstrate that the absence of an opportunity to comment on the [amendment] resulted in any prejudice that could be cured by a remand." <u>Sierra Club v. U.S. Army Corps of Engineers</u>, 450 F. Supp. 2d 503, 536 (D.N.J. 2006), <u>vacated on other grounds</u>, 277 Fed. App'x 170 (3d Cir. 2008); <u>see also</u> 5 U.S.C. § 706 (requiring courts, when reviewing agency action, to take "due account" of "the rule of prejudicial error").  The Corps received extensive comments from the public on the Anchor Bay development

since 2002.  Moreover, despite the fact that the Corps did not issue public notice of the August 2008 amendment, it nevertheless received comments and included them in the administrative record.[114] The Corps was well aware of the strong views held by the public on the Anchor Bay development.  Cf. Friends of Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 997 (9th Cir. 1993) (holding that the Corps was not required to hold a public hearing when it had already received extensive comments and was "aware of strong support on both sides").  Plaintiffs simply have not shown that an additional opportunity to comment on Permit SWG-2007-388 "would have influenced the . . . Corps' decision to issue the [p]ermit . . . ."  Sierra Club, 450 F. Supp. 2d at 536.  See also Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 61-62 (1st Cir. 2001) ("Agency missteps too may be disregarded where it is clear that a remand would accomplish nothing beyond further expense and delay." (internal quotation marks omitted)).

### III.  Intervenors' Motion for Sanctions

Intervenors move the court to impose sanctions on Plaintiffs' counsel under 28 U.S.C. § 1927.  This statute provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees

---

[114]AR at 2342-95.

reasonably incurred because of such conduct."  28 U.S.C. § 1927.
Intervenors contend that sanctions are appropriate because "this
lawsuit is frivolous and brought for the wrongful purpose of
delaying the Anchor Bay development by tying up the permit process
in court."[115]  Because the court will grant some of the relief
requested by the Plaintiffs, this action is not frivolous.
Accordingly, sanctions under 28 U.S.C. § 1927 are not appropriate,
and the court will deny Intervenors' motion.

## IV.  Conclusion and Order

Based on the foregoing analysis, Plaintiffs' Motion for
Summary Judgment (Docket Entry No. 63) is **GRANTED in part and
DENIED in part**.  Intervenors' Cross-Motion for Summary Judgment
(Docket Entry No. 77) is **GRANTED in part and DENIED in part**, and
Defendants' Motion for Summary Judgment (Docket Entry No. 80) is
**GRANTED in part and DENIED in part**.  Intervenors' motion to assess
expenses and attorneys' fees against plaintiffs' counsel pursuant
to 28 U.S.C. § 1927 (Docket Entry No. 77) is **DENIED**.

This matter is **REMANDED** to the Corps for further proceedings,
including the preparation of a new EA, a new FONSI, or an EIS, or
other appropriate disposition consistent with this opinion.  Permit

---

[115]Intervenors' Amendment to Response to Plaintiffs' Motion for
Summary Judgment and Intervenors' Cross-Motion for Summary
Judgment, Docket Entry No. 77, at 26-27.

SWG-2007-388 is **ENJOINED** until the Corps has fully satisfied its obligations under NEPA.[116]

**SIGNED** at Houston, Texas, on this 11th day of March, 2009.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[116]The court concludes that enjoining the permit, rather than voiding it as Plaintiffs request, is the appropriate remedy.  See, e.g., Lafitte's Cove at Pirates' Beach Nature Society v. U.S. Army Corps of Engineers, No. Civ. A. G-04-185, 2004 WL 3186592, at *7 (S.D. Tex. Dec. 14, 2004) (enjoining, rather than voiding, a permit based on the Corps' failure to comply with NEPA requirements).